IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT KNOXVILLE

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 3:11-CR-139 |
| | ) | |
| WILLIAM L. BOST, | ) | (VARLAN/SHIRLEY) |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION

All pretrial motions in this case have been referred to the undersigned pursuant to 28 U.S.C.

§ 636(b) for disposition or report and recommendation regarding disposition by the District Court

as may be appropriate. This case is before the Court on the Defendant's Motion to Suppress

Evidence Obtained as Result of Unlawful Search [Doc. 24], filed on February 17, 2012. The

Government responded [Doc. 25] in opposition to the motion on March 2, 2012. The Court held an

evidentiary hearing on March 13, 2012. Assistant United States Attorney Cynthia F. Davidson

represented the Government. Attorneys Gregory P. Isaacs and Andrea Brooke Mohr appeared on

behalf of the Defendant, who was also present. The Government presented the testimony of

Knoxville Police Officers Horace Lane, James Hunley, and Richard Wallace. The parties also

presented oral argument on the issues. At the conclusion of the suppression hearing, the Court took

the motion, response, testimony, exhibits, and oral argument under advisement.

## I. POSITIONS OF THE PARTIES

The Defendant is charged in a single-count Indictment [Doc. 9] with possessing with intent

to distribute twenty-eight or more grams of crack cocaine on or about November 1, 2011. The Defendant argues that all evidence discovered and seized should be suppressed because the lawful traffic stop became an impermissible seizure when law enforcement officer lacked reasonable suspicion to justify further detention and used unreasonable physical restraint beyond the scope of a Terry stop without probable cause. The Defendant also claims that even if the initial detention was proper, the degree of intrusion into the Defendant's body was not reasonably related in scope to the circumstances and that all illegally seized narcotics and cellular telephones should thus be suppressed as fruits of the poisonous tree. The Government responds that the initial traffic stop, the brief detention, and the Terry stop and frisk were all lawful and the evidence was lawfully obtained.

## II. SUMMARY OF EVIDENCE FROM SUPPRESSION HEARING

### (A) Testimony of Officer Horace Lane

The Government called Officer Horace Lane, who testified that he works as a police officer for the Knoxville City Police Department. Officer Lane works on the commercial vehicle enforcement squad patrolling interstates within the city limits of Knoxville, Tennessee, looking for aggressive driving and other criminal activity. In addition to testifying about his other training and experience as a police officer, Officer Lane testified that he has attended classes and obtained instruction on drug behavior.

At approximately 3:30 p.m., on November 1, 2011, Officer Lane observed a truck illegally changing lanes on I-75 South, just before it meets I-275 South. Officer Lane testified about the traffic stop using the in-car video from his cruiser [Exhibit 1 to March 13, 2012 hearing]. As Officer Lane first moved his cruiser behind the Defendant's truck while driving on the interstate, he noticed

2

only that the truck's window tint appeared to be darker than is legally allowed. After a short time, Officer Lane witnessed the truck illegally cross over a solid white line to move to an exit ramp, changing lanes in a close proximity to the other cars in the vicinity. At that point, Officer Lane activated his emergency equipment, the blue lights and siren of his cruiser. Officer Lane decided to initiate a traffic stop at this point because of the illegal lane change, made without a turn signal, affecting the surrounding cars, over a solid white line.

Officer Lane testified that when he activated his emergency equipment and turned on his siren one time, the Defendant did not react at first, not signaling, or slowing down. The Defendant did not immediately attempt to pull over to the shoulder. Officer Lane then hit his siren again and the Defendant braked, pulling to the shoulder of the exit ramp. Officer Lane testified that the Defendant took a little "lenghthier" than the "normal person" would to stop his car. Officer Lane also testified that the Defendant "white-lined" the truck, parking closer to the road than he should have in the shoulder. Officer Lane testified that "white-lining" is not safe and is often done by drivers who do not want an officer to approach the driver's side of their cars. Officer Lane stated that he always approaches cars on the right passenger side during a traffic stop regardless of how close or far from the white line the driver parks.

After exiting his cruiser and approaching the Defendant's truck, Officer Lane had a conversation with the Defendant. During this discussion, Officer Lane noticed and noted to the Defendant that there were three cellular telephones in the truck, one of which was at the Defendant's feet. Officer Lane then asked the Defendant for permission to search the truck and the Defendant refused consent to search. Officer Lane testified that he has been trained that a suspect having three cellular phones in a vehicle "not normal" and is indicative of drug trafficking. Officer Lane testified

3

that as he spoke with the Defendant about the cell phones, the Defendant's demeanor indicated that he was trying to hide something, which the officer thought may have been alcohol. When he asked for consent to search the truck, Officer Lane had not yet called the traffic stop into the police department, so no one knew where he was "from an officer safety standpoint."

Officer Lane then asked the Defendant to exit the truck, and he testified that the Defendant hesitated and appeared to be making a decision as to whether to get out. Officer Lane related that the arm rest inside of the truck was down and that there was a child's booster seat in the front passenger seat. Officer Lane testified that the Defendant quickly shoved his hand down in between the console and the child's seat, "for apparently no reason." After observing that, Officer Lane instructed the Defendant to get his hand up, because at that point, the officer did not know if the Defendant was attempting to reach a weapon down in between the seat and the center console. Officer Lane testified that he went from "zero to high alert" at that point, so he told the Defendant again to put his hands in view. The officer got his firearm out, raised it to his chest, and had it at the ready. Officer Lane testified that the Defendant kept his hand in the crack, ignoring the officer, and after the third time Officer Lane asked, the Defendant looked up at him and slowly pulled his hand up and showed it.

Officer Lane then again told the Defendant get out of the truck, and at that point, he did not know whether the Defendant was armed. Officer Lane testified that "in my mind, it was a gun that he was going for" when the Defendant reached into the crack. Officer Lane stated that he at that point decided to "put him in custody" because the officer still had not had time to call in the stop and tell other officers where he was.

Officer Lane testified that the conversation when he first approached the truck was about the

4

reasons for the traffic stop and that he always informs people of why they are stopped because it can make them less nervous. Officer Lane related that in this instance, the conversation about the reasons for the stop did not appear to calm the Defendant's nerves. The officer stated that he asked the Defendant for his driver's license and proof of insurance when he walked up to the truck and that the Defendant did not have an insurance card. Describing the inside of the truck, Officer Lane testified that the truck was messy inside and that there were two smart cellular telephones on top of the center console and that a flip cellular telephone was laying on the floorboard by the Defendant's seat. Officer Lane also testified that he asked the Defendant why it took him so long to stop and that he did so because the Defendant had ample opportunity to stop or at least change his speed or signal that he was going to turn off before he did. Officer Lane also testified that the Defendant rolled forward in the shoulder for an unusual amount of time before completely stopping the truck. Officer Lane stated that depending on the surrounding traffic, once he activates his emergency equipment, he usually sees a reaction from the driver to attempt to slow down and get to the side of the road and that most drivers stop after rolling between twenty or thirty yards once they reach the emergency lane.

Officer Lane testified that the reason he asked the Defendant to step out of his truck was so that he could continue conducting the traffic stop and alert dispatch of his location. Officer Lane related that he "routinely" asks drivers to exit their cars at traffic stops because he can read body language better outside of the car, because he can write citations and check records, and because if you leave them in the car, they may have access to weapons. Officer Lane testified that he did not ask the Defendant to exit because of the denial of consent to search and instead that, he had "already built enough up in [his] reasonable suspicion to believe that there was another criminal activity going

on." The officer did not know what else was going on, but he felt like he needed to investigate further.

Officer Lane testified that he was scared when the Defendant put his hand down between the center console and the child's seat. Officer Lane testified that it is possible that the Defendant did not hear him when he first told him to show his hands, but he had said he was "pretty verbal." When the Defendant exited the truck, the officer handcuffed him and said he did so for his officer safety. While standing behind the truck, Officer Lane attempted to have the Defendant spread his legs, and the officer testified that the Defendant resisted. Officer Lane asked the Defendant why he was not cooperating and told the Defendant that he thought he was hiding something.

At that point, Officer Lane called the traffic stop into dispatch, and he asked for a K-9 unit because he thought there was something in the truck. Officer Lane asked if the Defendant had anything on his person, and the Defendant stated that he had money. Officer Lane then stated, "whatever you are hiding is not worth getting shot over." The Defendant told the officer that he had a bad back, so the officer sat him against the hood of the cruiser. Officer Lane testified that the Defendant was not acting "normal" and that he was "nonchalant and kind of mumbling," not making eye contact. The officer was trying to gain a rapport with the Defendant to determine what the Defendant was hiding. Officer Lane testified that it is not uncommon for him to ask a suspect to spread his legs to pat them down for weapons. When the Defendant did not comply with the command to spread his legs, Officer Lane attempted to push the Defendant's legs apart, and he "clenched them up" to prevent this, so the officer pushed them apart with his foot. After that, Officer Lane patted the Defendant down. He did not find any weapons, but felt a bulge in the Defendant's front right pocket which the Defendant related was money. In addition to accommodating the

6

Defendant's bad back, Officer Lane put the Defendant on the hood of the cruiser so that he could make eye contact with him and gauge his demeanor.

While Officer Lane and the Defendant spoke more and the Defendant continued to not make eye contact, Officer Lane noticed that the Defendant had something inside of his mouth. Officer Lane told the Defendant to open his mouth, and the officer thought that the Defendant started "to chew rapidly" and attempt to swallow. Officer Lane thought that the Defendant was attempting to swallow contraband, so he tried to prevent him from swallowing it by putting his hand inside of the Defendant's mouth. When the officer put his fingers in the Defendant's mouth, Officer Lane stated that the Defendant bit down on his fingers. Officer Lane told the Defendant to stop biting, and he did not comply, so the officer used his pinky finger to do "pain compliance" to try to get the Defendant to stop biting because the skin was broken. Officer Hunley arrived during the struggle and assisted Officer Lane in getting his fingers out of the Defendant's mouth, at which point the Defendant fell to the ground. The Defendant then spit out chewing gum. The Defendant stated repeatedly that he did not mean to bite Officer Lane.

Officer Hunley then found what appeared to be cocaine in a plastic bag underneath the truck. Officer Wallace, the K-9 unit, arrived. Another bag of cocaine was found on the ground near where the struggle between Officer Lane and the Defendant took place. Officer Wallace brought his K-9 around the truck and the K-9 alerted the truck. When Officers Wallace and Hunley did a more thorough pat down of the Defendant, they found a third bag of what appeared to be cocaine inside his pants. Officers Wallace and Hunley searched the truck. Nothing was found during the search of the truck except for a "hidden compartment" under the arm rest, in the vicinity of where the Defendant reached earlier. There was somewhere between $1200 and $1600 on the Defendant's

7

person.

On cross-examination, Officer Lane testified that he is trained to look for certain indicators of vehicles for criminal activity in doing his job, but that this training does not include treating the different types of cars differently during initial traffic stops. Officer Lane testified that at the point when he pulled the Defendant over, he had probable cause to issue a citation for a traffic violation. Officer Lane conceded that every traffic stop he does is potentially a drug interdiction stop. He stated that he treats every traffic stop the same way. Officer Lane testified that when he approached the truck, he had no reasonable suspicion related to narcotics. Officer Lane reiterated that during the time when he spoke with the Defendant in the truck, the Defendant was not acting like the "general motoring public" does.

When Officer Lane approached, he told the Defendant that he pulled him over because he changed lanes crossing a solid white line, that he got to close to the other cars when he did so, that he was not wearing a seatbelt, and that he did not use a traffic signal. The Defendant gave the officer his driver's license and vehicle registration without incident. Officer Lane testified that he had no reasonable suspicion related to narcotics at that point. Officer Lane and the Defendant had a discussion about bulbs in taillights and turn signals. Officer Lane stated the Defendant taking too long to stop his truck and parking too close to the white line when he did so are things he looks for as indicators of criminal activity during traffic stops. Officer Lane testified that the following things built his reasonable suspicion that the Defendant was involved in some form of criminal activity: the amount of time it took the Defendant to stop, the unsafe lane change, his having parked too close to the white line, the disheveled interior of the truck, and the three cellular phones inside of the truck.

Officer Lane testified that if the Defendant had two instead of three cellular phones it would

8

still have been an "indicator" to him. Officer Lane related that he attended a drug interdiction school where he learned about the abnormality of having three cellular telephones. The officer testified that the Defendant's demeanor changed when he was asked about the cellular phones. The Defendant stated that two of the telephones were charging and Officer Lane testified that when asked about the additional one at his feet, the Defendant ignored the question. Officer Lane testified that the Defendant did not appear nervous when they were first speaking, but qualified that it was no more nervous than a normal motorist who is stopped.

After viewing the in-cruiser video again, Officer Lane related that in situations with which he has been involved where drivers stop the way that the Defendant did, the drivers have been hiding something such as beer or drugs. Officer Lane testified that he was predisposed to thinking that there was some form of criminal activity going on when he approached the truck. Officer Lane stated that the tone of the traffic stop changed not when he saw the three cellular telephones, but when the officer asked the Defendant about the telephones and his demeanor changed. The Defendant told the officer an explanation, the specifics of which Officer Lane could not recall during his testimony, for why it took him what the officer considered to be a long time to stop his truck.

Officer Lane did not smell alcohol or narcotics when he spoke with the Defendant and the Defendant did not appear to be impaired. Officer Lane observed no contraband, such as narcotics or weapons, in plain view when he spoke with the Defendant after approaching the truck. After observing the three cellular telephones, Officer Lane immediately asked if there were any drugs or weapons in the truck. After the Defendant responded in the negative, Officer Lane immediately asked if he could search the truck. Officer Lane testified that he did not notice the Defendant chewing gum during their conversation.

9

The officer related that he thought the Defendant was attempting to swallow narcotics when he reached into his mouth. Officer Lane identified the Knoxville Police Department Crime Report [Exhibit 2 to March 13, 2012 hearing], which was prepared by another officer, Officer Dianna Parrin, based on a conversation with Officer Lane. Exhibit 2 provides that the Defendant "was observed chewing something" and that "[u]pon noticing this action the Officer felt he may be in danger of hurting himself by continuing to eat an unknown substance and proceeded to try and remove the item." Officer Lane testified that he did not know what was in the Defendant's mouth when he put his fingers in but that he thought it was drugs. Officer Lane stated that it could have been a danger for the Defendant to swallow the unknown substance.

Viewing the cruiser video from when Officer Lane first instructed the Defendant to exit the vehicle and then drew his weapon, the officer emphasized how quickly the Defendant reached over and put his hand out of sight in between the center console and the child's seat. Officer Lane testified that when the Defendant eventually complied and exited the truck, he did not have a weapon or anything else in his hands, but the officer did not know if he may have had a weapon in his waistband. Officer Lane stated that the Defendant "was going to be placed in custody" when he got out of the truck. Officer Lane testified that he did not read the Defendant his Miranda rights or provide a rights waiver form and that he had not asked any questions at that point. When asked at the hearing what the Defendant was under arrest for when he got out of the truck, Officer Lane testified that he was "under arrest for my officer safety" because he did not know if there were any weapons present. Officer Lane stated that he was in fear for his life at one point. He related that he put the Defendant in custody because he had already broken misdemeanor traffic law and because he needed to for the officer's safety. Officer Lane stated that the Defendant's action in putting his

10

hand between the console and the child's seat was "totally erratic" and that his failure to take his hand out and lift it until the officer had his weapon drawn was "not what a normal person would do."

Officer Lane testified that when the Defendant got out of the truck he did not approach him in an aggressive manner and the Defendant allowed the officer to handcuff him. The officer stated that when the Defendant exited he treated him as a threat because he thought of him as a threat. The Defendant did not resist being placed in handcuffs. Officer Lane again testified that the Defendant resisted spreading his legs for the pat down, and he related that his training has taught him that suspects who resist spreading their legs are usually trying to hide weapons or drugs or some other contraband. The Defendant did not struggle during the pat down. The Defendant stated that he got out of the car and was being compliant.

While the Defendant was sitting on the hood of the cruiser, Officer Lane continued to ask him what he was hiding and if there was any contraband in the truck. Officer Lane testified that he did not give the Defendant time to answer after telling him to open his mouth because the Defendant started to chew "aggressively." Officer Lane testified that it happened quickly and that it was a "split-second decision" for him to reach into the Defendant's mouth to attempt to prevent him from swallowing. When Officer Lane's fingers were in the Defendant's mouth, he and other officers brought the Defendant to the ground. Officer Lane repeatedly asked the Defendant why he was lying. After he was handcuffed, the Defendant never attempted to flee, seemed defeated, would not make eye contact, and never used profanity.

Officer Lane testified that the whole traffic stop escalated because of the Defendant putting his hand between the seats. When the Defendant asked why he was in handcuffs, Officer Lane told him that he did not know, but he testified that he did so to build a rapport with the Defendant.

11

Officer Lane confirmed that the Defendant apologized many times for biting his hand. Officer Lane stated that based on his training and experience, he should have read the Defendant his <u>Miranda</u> rights when he was in custody if he is asking him questions, but he did not read them to him at this point in this situation. Officer Lane related that the Defendant had not made any statements while at the scene.

*(B) Testimony of Officer James Hunley*

The Government next called Officer James Hunley, who testified that he works for the Knoxville Police Department and responded as a backup officer to the stop of the Defendant on November 1, 2011. Officer Hunley testified that when he arrived at the scene he saw Officer Lane and the Defendant struggling and saw that Officer Lane's fingers were in the Defendant's mouth. Officer Hunley then put his hands on the Defendant's throat because he thought he was swallowing something, and the three men went to the ground. Shortly afterward, Officer Hunley found a baggy on the ground with a white substance in it. Officer Hunley stood the Defendant up. Officer Hunley testified that the Defendant was a little bit non-compliant in that he did not want to be searched. This reluctance led Officer Hunley to believe that the Defendant probably had more contraband in his shorts, and another bag with a white substance fell out of his shorts. In sum, the officers found a baggy under the rear bumper of the truck, on the ground after the officers struggled with the Defendant, and one that fell out of the Defendant's shorts.

*(C) Testimony of Officer Richard Wallace*

Finally, the Government called Officer Richard Wallace, who testified that he works for the Knoxville Police Department with a K-9 named Miki. Officer Wallace testified that Miki has been determined to be a reliable alerting drug dog. When Officer Wallace arrived at the scene, the

Defendant was on the ground next to Officer Lane's cruiser with Officers Lane and Hunley. Officers Wallace and Hunley took the Defendant to the rear of Officer Lane's cruiser and put him in the back of the car. Office Wallace testified that as the Defendant spread his legs upon Officer Hunley's request, a clear bag fell out of his shorts.

Officer Wallace testified that Miki alerted the Defendant's truck. Officer Wallace stated that the officers found three cell phones and sound cash inside of the truck. Officer Wallace related that the officers also found a secret compartment in the truck. Officer Wallace testified that he has taken Miki to some traffic stops where Miki did not alert the vehicle.

### III. FINDINGS OF FACT

The Court finds the following facts to be relevant in addressing the issues presented: Officer Lane observed the Defendant's truck illegally changing lanes when it crossed a solid white line in close proximity to other cars without signaling. Officer Lane initiated a traffic stop, and the Defendant delayed in pulling his truck into the shoulder of the exit ramp. Officer Lane approached the truck, and the Defendant, who was not wearing a seatbelt, provided him with a valid license and vehicle registration, and informed him that he did not have proof of insurance in the truck. Officer Lane informed the Defendant the reasons he stopped him, and the two men engaged in a calm conversation about turn signals. During the conversation, Officer Lane observed three cellular telephones in the truck, and he asked the Defendant about the telephones. The Defendant did not provide a clear response as to why he had three cellular telephones, and Officer Lane felt as though the Defendant's demeanor changed at that point.

After not receiving a satisfactory response about the telephones, Officer Lane asked the

Defendant if he had drugs or alcohol in the truck and the Defendant responded that he did not. Officer Lane then asked if he could search the truck, and the Defendant politely declined to give consent. Officer Lane told the Defendant to step out of the truck and at that point perceived the Defendant putting a hand in between the center console and a child's seat in the front passenger seat. Officer Lane pulled his weapon and loudly and quickly instructed the Defendant three times to get his hand out from between the seats and to show his hands. After several seconds, the Defendant eventually complied. Officer Lane again told the Defendant to get out of the truck, and the Defendant did so.

Officer Lane immediately handcuffed the Defendant, who did not struggle or attempt to flee. Officer Lane told the Defendant that if he moved, he would tase him. After the Defendant did not spread his legs to the officer's liking, Officer Lane pushed the Defendant's legs open with his feet. Officer Lane then patted the Defendant down and did not find any weapons or contraband. Officer Lane felt a bulge in the Defendant's front pocket which the Defendant informed him was money. Officer Lane repeatedly told the Defendant that he thought he was hiding something and asked him what it was.

Officer Lane put the Defendant on the hood of his cruiser, still in handcuffs, and the two talked more for a short time. Officer Lane observed that the Defendant was chewing on something in his mouth, and he instructed the Defendant to open his mouth. Approximately two seconds later, Officer Lane lunged forward reached into the Defendant's mouth. Officer Lane thought the Defendant started to chew rapidly after he asked him about what was in his mouth. While the Defendant and the officer struggled, Officer Hunley arrived and put his hands on the Defendant's neck. The three men went to the ground, and the Defendant spit out the chewing gum that was in

14

his mouth. Toward the end of the struggle, Officer Wallace and his K-9 arrived at the scene. The officers found three bags of crack cocaine: one underneath the rear bumper of the Defendant's truck, one on the ground near the struggle at the cruiser, and one on the Defendant's person. The K-9 alerted the truck, but when it was searched no contraband was found. The officers also seized the three cellular telephones in the truck.

## IV.  ANALYSIS

In his motion [Doc. 24], the Defendant argues that he was improperly seized in violation of his Fourth Amendment rights when the law enforcement officer lacked probable cause and reasonable suspicion to detain him and did so by asking him to get out of his truck and immediately handcuffing and searching the Defendant's person. The Defendant contends that Officer Lane's aggressive and violent manner in reaching into the Defendant's mouth to extract his chewing gum illustrates that the officer was illegally attempting to make a lawful traffic stop into a narcotics case. The Government responds [Doc. 25] that the officer had reasonable suspicion to initiate a traffic stop of the Defendant. The Government maintains that it was appropriate for the officer to ask the Defendant to step out of his truck and that the officer had reasonable suspicion to conduct a Terry pat down when the Defendant exited.

The Fourth Amendment protects citizens against unreasonable searches or seizures. U.S. Const. amend IV. Not every contact between a police officer and a member of the public is a seizure. United States v. Winfrey, 915 F.2d 212, 216 (6th Cir. 1990). "The Supreme Court has identified three types of reasonable, and thus permissible, warrantless encounters between the police and citizens:

> (1) consensual encounters in which contact is initiated by a police officer without any articulable reason whatsoever and the citizen is briefly asked questions; (2) a temporary involuntary detention or Terry stop which must be predicated upon "reasonable suspicion;" and (3) arrests which must be based upon "probable cause."

United States v. Pearce, 531 F.3d 374, 380 (6th Cir. 2008). A police-citizen encounter does not implicate the Fourth Amendment until some coercive or intimidating behavior occurs causing the defendant reasonably to believe that compliance is compelled. United States v. Collis, 766 F.2d 219, 221 (6th Cir.), cert. denied, 474 U.S. 851 (1985). Nor is there any Fourth Amendment implication before a defendant is stopped or searched. United States v. Saucedo, 226 F.3d 782, 789 (6th Cir. 2000).

The Court will first consider the propriety of the traffic stop. Next, it will analyze whether the police had reasonable suspicion to conduct a Terry pat down of the Defendant and, if so, whether law enforcement exceeded the reasonable scope of that pat down.

*(A) Propriety of the Stop*

If an "officer has probable cause to believe that a traffic violation has occurred or was occurring, the resulting stop is not unlawful and does not violate the Fourth Amendment." United States v. Ferguson, 8 F.3d 385, 391 (6th Cir. 1993), cert. denied, 513 U.S. 828 (1994). Whether a traffic stop is an unreasonable seizure in violation of the Fourth Amendment is assessed, like other alleged Fourth Amendment violations, by objectively evaluating the officer's conduct in light of the surrounding circumstances known to the officer. Id. at 388. Probable cause is "reasonable grounds for belief supported by less than prima facie proof but more than mere suspicion," United States v. Bennett, 905 F.2d 931, 934 (6th Cir. 1990). In other words, probable cause means a substantial chance or likelihood of criminal conduct. Ferguson, 8 F.3d at 392 (citing Illinois v. Gates, 462 U.S.

16

213, 244 n.13 (1983)). If a traffic stop is properly supported by probable cause, "it is irrelevant what else the officer knew or suspected about the traffic violator at the time of the stop." Id. at 391.

In this case, the Defendant does not contest that probable cause existed to believe that a traffic violation occurred, namely that he changed lanes on the interstate illegally when he crossed a solid white line without a signal and affected the surrounding cars. He thus concedes that the initial traffic stop was lawful. Upon review of the in-car video from Officer Lane's cruiser [Exhibit 1], the Court notes that the Defendant crossed over a solid white line in close proximity to other vehicles at approximately 15:26:43. Accordingly, the Court finds that probable cause existed to stop the Defendant for a traffic violation when Officer Lane initiated the traffic stop. Although he concedes that the initial traffic stop was lawful, the Defendant argues the lawful traffic stop was unreasonably extended beyond its permissible scope in violation of the Fourth Amendment when Officer Lane conducted a Terry stop.

*(B) Propriety of the Detention and Frisk*

The Defendant argues that he was lawfully pulled over for a minor traffic violation and was initially asked routine questions typical of such a stop, but that when the officer observed three cellular telephones, he drastically changed his tone "and the routine traffic stop suddenly changed into a seizure and search for narcotics" [Doc. 24 at 1]. The Defendant also argues that the search which was not based upon probable cause "went significantly beyond a reasonable Terry frisk and pat down" when the Defendant "was handcuffed, detained, and not free to leave immediately upon exiting the vehicle" [Id. at 2]. The Government argues that the lawful "traffic stop did not last for an extended period of time" and that "the stop and brief detention of defendant was proper" [Doc. 25 at 4]. The Government asserts that the officer acted lawfully in asking the Defendant to step out

17

of his truck. The Government contends that the Defendant's refusal to comply with the officer's instruction to show his hands, when taken with the other circumstances surrounding the stop, gave Officer Lane "an articulable and objectively reasonable belief that [the Defendant was] potentially dangerous," such that it was proper for him to handcuff the Defendant and conduct a Terry pat for weapons [Id. at 4-6].

*(1) Scope of the Detention*

When an officer has probable cause to believe a traffic violation has occurred he may stop the vehicle. United States v. Davis, 430 F.3d 345, 352 (6th Cir. 2005). "However, once the purpose of the traffic stop is completed, a police officer may not further detain the vehicle or its occupants unless something that occurred during the traffic stop generated the necessary reasonable suspicion to justify a further detention." United States v. Torres-Ramos, 536 F.3d 542, 550 (6th Cir. 2008) (citations and internal quotations omitted). In analyzing the propriety of detention based upon reasonable suspicion of criminal activity, the Court must first determine what the initial scope of the traffic stop was and the point at which that scope was exceeded. Id.

After defining the "scope and duration of the stop," the Court will determine whether Officer Lane had reasonable suspicion to lawfully extend the stop at the time the Defendant's detention began. See id. "In order to remain within the scope of the initial traffic stop, the officer's actions must reasonably relate to the purpose of the original stop." United States v. Bonilla, 357 F. App'x 693, 696 (6th Cir. 2009) (citing United States v. Bell, 555 F.3d 535, 541 (6th Cir. 2009)). Because Officer Lane stopped the Defendant because of an illegal lane change, the original purpose of the traffic stop appears to have been writing a traffic citation for that violation. Accordingly, the Court "must determine the point at which the original purpose of the stop-writing the traffic citation-ceased

18

and the detainment of [the Defendant] began." <u>See</u> <u>Bonilla</u>, 357 F. App'x at 694 (citing <u>Torres-Ramos</u>, 536 F.3d at 550).

As part of the initial stop, an officer who stops a person for a traffic violation based upon probable cause can detain the person while he or she completes a records check and issues a citation. <u>See</u> <u>United States v. Wellman</u>, 185 F.3d 651, 656 (6th Cir. 1999). Additionally, "once a motor vehicle has been lawfully detained for a traffic violation, the police officers may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." <u>Pennsylvania v. Mimms</u>, 434 U.S. 106, 111 & n.6 (1977); <u>United States v.</u> <u>Burton</u>, 334 F.3d 514, 519 (6th Cir. 2003). The officer may also ask the defendant questions, as long as those questions are reasonable under the circumstances:

> Questions that hold potential for detecting crime, yet create little or no inconvenience, do not turn reasonable detention into unreasonable detention. They do not signal or facilitate oppressive police tactics that may burden the public--for all suspects (even the guilty ones) may protect themselves fully by declining to answer. Nor do the questions forcibly invade any privacy interest or extract information without the suspects' consent.

<u>Id.</u> at 518 (quoting with approval <u>United States v. Childs</u>, 277 F.3d 947, 954 (7th Cir.) (en banc), <u>cert. denied</u>, 537 U.S. 829 (2002)); <u>see also</u> <u>United States v. Garrido-Santana</u>, 360 F.3d 565, 574-75 (6th Cir. 2004) (holding that an officer's questioning of an individual detained pursuant to a traffic stop does not violate the Fourth Amendment as long as the questions do not unduly prolong the stop beyond its original purpose). Moreover, using a "'a well-trained narcotics-detection dog'" during the course of a lawful traffic stop does not alone "infringe any constitutionally protected privacy interests." <u>Bonilla</u>, 357 F. App'x at 696-97 (quoting <u>Illinois v. Caballes</u>, 543 U.S. 405, 409 (2005)).

19

The Defendant asserts that "the issue of when the traffic stop ended is complicated by the fact that Officer Lane never began writing a citation" and contends that the Court cannot making a finding of fact related to the amount of time it takes an officer to issue a citation or "arbitrarily define the scope of the traffic stop" [Doc. 24 at 7-8]. The Defendant argues "that the traffic stop ended and the detention began when the officer's questions ceased being 'necessitated by the suspected traffic violation' after the officer observed three cellular telephones." [Id. at 8 (citing United States v. Ellis, 497 F.3d 609, 614 (6th Cir. 2007)]. The Defendant claims that Officer Lane's inquiry as to why it took the Defendant an unusually long time to pull over and stop his truck after the traffic stop was initiated was the "turning point," "less than two minutes after the initial stop," after which the officer began questioning the Defendant about hiding illegal activities and requested consent to search [Id. at 8-9]. In his motion, the Defendant contends that the discovery of the cellular telephones was what changed the course of the routine traffic stop and escalated the situation beyond what is permissible under the Fourth Amendment. While the Government argues that the officer "posses[ed] an articulable and objectively reasonable belief that the suspect [wa]s potentially dangerous," it does not suggest a point at which the initial traffic stop transformed into a detention based upon reasonable suspicion.

As in Torres-Ramos, the officer in this case never began issuing a traffic ticket. See 536 F.3d at 550-51. The Court agrees with the Defendant that it cannot "arbitrarily define the scope of the traffic stop by making a finding of fact that a [traffic] ticket usually takes a certain period of time for an officer to issue." Id. at 551. Officer Lane requesting and being denied consent to search the Defendant's truck "did not [in itself] extend the stop beyond its permissible scope." See id.; see also Burton, 334 F.3d at 518-19. In United States v. Blair, the Sixth Circuit determined that "the purpose

20

of the initial stop ended when the officer had collected sufficient information to issue the citation for the initial traffic stop." 524 F.3d 740, 752 (6th Cir. 2008). In this case, the span of the initial stop lasted only minutes and no issue has been raised with regard to the length of the detention. Officer Lane likely had most or all of the information he needed to cite the Defendant for the illegal lane change, no proof of insurance, and a seatbelt violation at a point shortly after approaching the truck and obtaining the Defendant's driver's license and registration. "From that point forward, the purpose of the traffic stop would have been completed almost immediately, in the time necessary for Officer [Lane] to issue the citation and send [the Defendant] on his way." See Blair, 524 F.3d at 752.

In Blair, the Sixth Circuit held that the officer's action of informing the defendant that he thought drugs were in the defendant's car and that he was calling a K-9 unit after having been denied consent to search the car extended the scope and duration of the traffic stop beyond what was necessary for the issuance of the initial citation. Id. In this case, given the fact that Officer Lane had not yet returned to his cruiser to run a check on the Defendant's driver's license, issue a citation, and do other things standard in routine traffic stops, the Court has heard insufficient proof to make a finding as to the amount of time it would have reasonably taken him to issue an illegal lane change citation. Thus, the Court cannot determine whether that amount of time had been exceeded when Officer Lane pulled his weapon and pointed it at the Defendant after the Defendant put his hand in between the center console and the child's seat and did not comply with commands to raise his hands quickly, and then immediately handcuffed the Defendant upon his exit from the truck. Regardless of the point at which the scope of the initial traffic stop was exceeded, as more fully discussed below, the intervening fact of the Defendant having put his hand out of view and having delayed in

21

complying to show his hands provided reasonable suspicion to extend the traffic stop beyond the duration and scope permissible based upon the initial purpose of the stop.

As stated above, if a vehicle has been lawfully stopped based upon probable cause, an officer "may order the driver to get out of the vehicle without violating the Fourth Amendment's proscription of unreasonable searches and seizures." Mimms, 434 U.S. at 111. It was, thus, permissible for Officer Lane to ask the Defendant to get out of the truck. The questions the officer posed to the Defendant prior to asking him to exit, such as whether he had drugs or alcohol in his truck, as they did not unnecessarily lengthen the stop, were also permissible. Once Officer Lane pulled his weapon and pointed it at the Defendant when the Defendant put his hand out of view and was slow to comply with commands ordering him to show it, aggressively ordered the Defendant out of the truck, and immediately placed him in handcuffs behind the truck, the initial traffic stop was transformed into a detention for which the officer needed reasonable suspicion. The Court will now determine if Officer Lane had the requisite reasonable suspicion to further detain the Defendant beyond what was necessary to issue a traffic citation at that point.

*(2) Frisk of the Defendant's Person*

An individual stopped for a traffic violation may be frisked for weapons if a reasonable person would conclude that the detainee "might be armed and presently dangerous" based upon the circumstances known at the time. Mimms, 434 U.S. at 111-12; see also Michigan v. Long, 463 U.S. 1032, 1048 (1983). "The focus of judicial inquiry is whether the officer reasonably perceived the subject of a frisk as potentially dangerous, not whether he 'had an indication' that the defendant was in fact armed." United States v. Bell, 762 F.2d 495, 500 n.7 (6th Cir. 1985). "The purpose of this limited [Terry] search is not to discover evidence of crime, but to allow the officer to pursue his

investigation without fear of violence, and thus the frisk for weapons might be equally necessary and reasonable, whether or not [the defendant is] carrying" the weapon in question is a violation of law. Adams v. Williams, 407 U.S. 143, 146 (1972).

While the Defendant centers his argument on the fact that the officer lacked reasonable suspicion that the Defendant was involved in illegal narcotics activity, the Government argues that Officer Lane had specific and articulable facts to justify his "stop and inspection of the [D]efendant" based on a reasonable belief that he was armed and dangerous [Doc. 25 at 5]. The Government asserts the following facts that it argues, when taken together, are sufficient for Officer Lane to have initiated a Terry stop when he ordered the Defendant out of the truck and placed him in handcuffs, in essence detaining him beyond the permissible scope of the initial stop:

> The [D]efendant did not immediately stop upon the initiation of emergency lights, the [D]efendant acted nervous when questioned about his three cell phones, the [D]efendant acted like he did not see the cell phone laying at his feet, the [D]efendant moved his hand out of view of the officer, and finally the [D]efendant's refusal to follow Officer Lane's command to show his hands until the office pulled his gun and ordered him to comply three times.

[Id.]. The Government further contends that "[t]he cruiser video clearly shows that Officer Lane becomes concerned for his safety when the [D]efendant continues to hide his right hand from view" [Id.]. Inapposite to the Defendant's argument that the officer's observation of the three cellular telephones in the Defendant's truck drastically transforms the nature of the traffic stop, the Government contends that it is the Defendant's movement of his hand between the center console and the child's seat and his refusal to move the hand back into the officer's view immediately which concerned Officer Lane and, when taken together with the other facts known to him at the time, led to Officer Lane's articulable and objectively reasonable belief that the Defendant may have been

dangerous.

*(i) First Search*

The Court finds that at the time when Officer Lane placed the Defendant in handcuffs behind the truck, spread his legs, and patted him down, he had a reasonable belief that the Defendant may have been armed and dangerous, such that it was permissible for him to conduct a brief and limited search for the presence of weapons. See Mimms, 434 U.S. at 111-12. When the Defendant put his hand out of view of the officer, as Officer Lane testified, after having been asked to exit his vehicle, it was reasonable for Officer Lane to believe that the Defendant may have been reaching for a dangerous weapon. Although the entirety of the exchange happened quickly, the Defendant did not immediately place his hand into view and did not do so until Officer Lane pulled out his weapon and pointed it at the Defendant, yelling for him to show his hands. The Court notes that the in-car video does not show the Defendant's hand movements or lack of compliance with instructions to show his hands, but Officer Lane's testimony was not discredited at the hearing and no evidence was presented to rebut his version of events.

Moreover, Officer Lane testified that his training told him that the presence of multiple cellular telephones in a vehicle is an indicator of narcotics activity. After seeing the three cellular telephones in the Defendant's truck, Officer Lane questioned the Defendant and received a vague answer as to their purposes and reasons for being inside. Officer Lane also testified that one cellular telephone, a flip telephone, was at the Defendant's feet as if he had just thrown it down and he stated that the Defendant ignored his questions about that telephone. It is reasonable for an officer to believe that a suspect may have a weapon if the suspect is involved in drug trafficking. See United States v. Williams, 272 F. App'x 473, 477-78 (6th Cir. Apr. 4, 2008); see also United States v. Till,

24

434 F.3d 880, 884 (6th Cir. 2006); United States v. Swafford, 385 F.3d 1026, 1030 (6th Cir. 2004). Accordingly, although the Court does not find that Officer Lane had reasonable suspicion that the Defendant was involved in criminal drug activity when he ordered the Defendant out of the truck, the fact that he had observed the three cellular telephones in the truck and reasonably perceived them as an indicator of possible involvement in drug trafficking contributed to his reasonable belief that the Defendant may have been armed and dangerous.

Based on that reasonable belief that the Defendant may have been armed and dangerous, it was permissible for Officer Lane to have the Defendant get out of his truck, handcuff him, and conduct a brief pat down for weapons to determine whether the Defendant was then presently armed and dangerous. See Williams, 407 U.S. at 146. When the circumstances of an investigatory detention reveal that the officer's safety is at risk, the Sixth Circuit has permitted greater intrusion into the detainee's personal freedom as a part of an investigatory detention. See United States v. Hardnett, 804 F.2d 353, 357 (6th Cir. 1986) (holding that officers were justified in blocking the defendant's car, approaching with guns drawn, and ordering the occupants out of the car as a part of the Terry stop based upon tip that the occupants were armed). Specifically, handcuffing a suspect does not "exceed the bounds of a Terry stop, so long as the circumstances warrant that precaution." Houston v. Clark County Sheriff Deputy John Does 1-5, 174 F.3d 809, 815 (6th Cir. 1999) (upholding handcuffing of suspects believed to have been involved in a shooting); see also United States v. Atchley, 474 F.3d 840, 849 (6th Cir. 2007) (determining that officer's handcuffing of defendant during investigatory detention was appropriate as a "safety precaution" when officers were investigating tip of methamphetamine laboratory, defendant lied to officers, and defendant was nervous and evasive); United States v. Heath, 259 F.3d 522, 530 (6th Cir. 2001) (approving

25

handcuffing of defendant at the inception of a <u>Terry</u> stop when the officers reasonably suspected defendant was carrying drugs and believed he might be armed due to their experience with drug traffickers); <u>United States v. Hurst</u>, 228 F.3d 751, 758, n.3 (6th Cir. 2000) (noting that "under the circumstances, where defendant was reasonably suspected of having just burglarized a home and might reasonably have been deemed armed and dangerous, the officers' attempt to use handcuffs as a precautionary measure to secure their safety was not unreasonable or otherwise improper).[1] Although each of these cases turn on their individual facts, in each of them, the officers had reason to believe the person being handcuffed posed a danger to the officers.

In this case, the basis for the initial <u>Terry</u> pat down was Officer Lane's reasonable belief that the Defendant may have been armed and dangerous and it thus follows that it was a reasonable precaution for Officer Lane, who was alone at the scene and had not yet informed dispatch or any other officers of the situation and his location, to handcuff the Defendant while he briefly patted him down to determine if he had any weapons on his person. Accordingly, the Court finds that handcuffing the Defendant in this case did not exceed the bounds of a <u>Terry</u> stop because "the

---

[1]The Court notes that the Sixth Circuit has also affirmed the use of handcuffs as a part of a <u>Terry</u> stop in several unpublished cases. <u>United States v. Boyette</u>, 295 Fed. Appx. 781, 785-86 (6th Cir. 2008) (determining that approaching car at gunpoint, handcuffing defendant and occupants, and detaining them in the police car was reasonably related to circumstances in which officers knew defendant to go armed and had information that he had a weapon in his car); <u>United States v. Powell</u>, 2000 WL 357262 (6th Cir. Mar. 29, 2000) (holding that handcuffing the defendant before conducting a frisk, which revealed the presence of a gun and drugs, was permissible as a part of a <u>Terry</u> stop due to officer's reasonable suspicion that the defendant was an armed carjacker); <u>United States v. Monhollen</u>, 1998 WL 152934 (6th Cir. Mar. 24, 1998) (holding handcuffing of defendant to be permissible as part of <u>Terry</u> stop when officer received a dispatch of a shooting and knew defendant had an extensive criminal history); <u>United States v. Walker</u>, 1995 WL 141343 (6th Cir. Mar. 31, 1995) (holding that officers reasonably handcuffed the defendant as a part of the <u>Terry</u> stop because the defendants tried to evade the officers and the officers suspected the defendants were armed based upon their past experience with drug traffickers).

circumstances warrant[ed] that precaution." See Houston, 174 F.3d at 815.

After Officer Lane patted the Defendant down and learned that he appeared only to have money in his pocket, Officer Lane had completed the scope of the limited search permissible pursuant to Terry, for weapons and not for further evidence of other criminal activity. The Court notes that the cash in the Defendant's pocket was later determined to have been a large sum in excess of $1,000. Officer Lane did not testify that he had any indication that the money was a surprisingly large cash wad or that it furthered a suspicion of drug activity. However, upon review of the in-car video, the Court notes that after the Defendant informed the officer that he had money in his pocket, Officer Lane asked him how much money he had and the Defendant responded that it was $1200 or $1300. After receiving that response, Officer Lane asked the Defendant why he had that much money and how many drugs he was dealing to require him to keep that amount of money on him. The Defendant did not remove the cash from his pocket at that point.

Because Officer Lane's pat down revealed no evidence of a weapon or any other indication that the Defendant was presently dangerous, he no longer had a reasonable belief that the Defendant was potentially dangerous after having finished patting him down behind the truck. However, Officer Lane conducted an additional search of the Defendant's person, when he forcibly reached into his mouth a few minutes later. Accordingly, because Officer Lane reasonably should have already been satisfied that the Defendant was not armed and dangerous after having conducted what limited search was permissible up to that point, the Court must now decide whether the officer obtained additional reasonable suspicion that criminal activity was afoot through the pat down and in the minutes following.

*(ii) Second Search*

27

After having handcuffed and patted down the Defendant, discovering no weapons, Officer Lane put the Defendant up against the hood of the cruiser and further talked with him. While Officer Lane continued to ask the Defendant what he was hiding and whether he was attempting to reach for or hide something when he reached down next to the console in his truck, Officer Lane abruptly instructed the Defendant to "open your mouth up" [Exhibit 1 at 15:34:20]. Approximately two seconds later, Officer Lane lunged forward toward the Defendant while again instructing him to open up his mouth [Exhibit 1 at 15:34:22]. Within one additional second, Officer Lane had his fingers in or nearly inside the Defendant's mouth [Exhibit 1 at 15:34:23]. Officer Hunley arrived at the scene while Officer Lane's fingers were still in the Defendant's mouth and put his hands on Defendant's neck within approximately five seconds of Officer Lane forcibly putting his fingers in the Defendant's mouth [Exhibit 1 at 15:34:28]. Less than ten additional seconds later, Officer Wallace, with the K-9 unit, arrived during the struggle [Exhibit 1 at 15:34:36]. Just after the officers took the Defendant to the ground and the Defendant spit the chewing gum out of his mouth, Officer Hunley saw and picked up a baggy with what he believed to be cocaine inside on the ground near the rear bumper of the Defendant's truck [Exhibit 1 at 15:35:08]. After the officers found a second and third baggy of cocaine, Officer Lane suggested that the K-9 search around the truck [Exhibit 1 at 15:38:19]. The K-9 alerted approximately two minutes later [Exhibit 1 at 15:40:20].

The Defendant argues that if the Court finds that his detention was proper based upon reasonable suspicion, Officer Lane's actions in reaching into his mouth two seconds after instructing him to open his mouth was unreasonable as not reasonably related to the circumstances at hand. The Defendant argues that the degree of intrusion when the officer reached into his mouth was great when he cursed at him, threatened to tase him, and instructed him to open his mouth, afterward

28

"immediately and aggressively physically restraining him without probable cause" [Doc. 24 at 17]. The Defendant argues that the physical search of the inside of a suspect's mouth goes beyond the permissible scope of a Terry frisk and that the officer's search by reaching into his mouth was beyond "'what was minimally necessary to learn whether the men were armed and to disarm them once he discovered the weapons'" [Id. at 18 (quoting Terry, 392 U.S. at 29-30)]. The Defendant further argues that the search by Officer Lane, who was acting only on a hunch that the Defendant was hiding something, exceeded the scope of a valid search incident to arrest (if the Court finds that he was then under arrest). The Government does not address the Defendant's arguments as they relate to the physical intrusion by the officer but does cite Herring v. United States, 555 U.S. 135 (2009), and argues that the Court should apply the good faith exception established by United States v. Leon, 468 U.S. 897 (1984).

Upon review of Exhibit 1, the Court agrees in part with the Defendant and finds that Officer Lane's action in conducting this second search of the Defendant, forcibly and aggressively putting his fingers inside the Defendant's mouth, was unreasonable as it was not based upon specific and articulable reasonable suspicion of narcotics activity, was greatly intrusive, and was not reasonably related to the first permissible search of the Defendant for weapons. Although the Court recognizes that Officer Lane had observed three cellular telephones in the Defendant's truck and that Officer Lane was aware that the Defendant had a large sum of cash in his pocket at the point when he made the "split-second decision" to search the Defendant's mouth, the Court does not find that those facts combine with the Defendant's traffic violation,[2] the failure to make eye contact, and the reaching

---

[2] Upon review of the video, the Court does not find anything particularly or notably abnormal about the Defendant's reaction to the initiation of the officer's emergency equipment, the amount of time that it took the Defendant to stop his truck, or how he parked it.

between seats, in the context of the officer already having frisked the Defendant's person and finding nothing, to authorize Officer Lane's actions here. Even assuming, *arguendo*, that the cellular telephones and the discovery of the cash on the Defendant, combined with Officer Lane's testimony that the Defendant started chewing rapidly when told to open his mouth provided reasonable suspicion of narcotics activity such that an additional brief and limited search of the Defendant would have been permissible, the Court does not find that the officer's actions in holding the Defendant down and reaching into his mouth a mere two seconds after having instructed him to open his mouth, a high degree of intrusion into the Defendant's person and privacy, were reasonably related to the situation at hand. See United States v. Caruthers, 458 F.3d 459, 464 (6th Cir. 2006).

The exclusionary rule generally applies to evidence seized in unreasonable searches and seizures, barring it from admission at trial. Wong Sun v. United States, 371 U.S. 471, 484-85 (1963). "The inevitable discovery doctrine, an exception to the exclusionary rule, allows unlawfully obtained evidence to be admitted at trial if the government can prove by a preponderance that the evidence inevitably would have been acquired through lawful means." United States v. Kennedy, 61 F.3d 494, 497 (6th Cir. 1995) (citing Nix v. Williams, 467 U.S. 431, 444 (1984)). To apply this exception, "it must be demonstrated that the evidence inevitably would have been acquired through lawful means had the government misconduct not occurred." Id. "The exception requires the district court to determine, viewing affairs as they existed at the instant before the unlawful search, what would have happened had the unlawful search never occurred." Kennedy, 61 F.3d at 498 (citation omitted). In Kennedy, the Sixth Circuit held that "the inevitable discovery exception to the exclusionary rule applies when the government can demonstrate *either* the existence of an independent, untainted investigation that inevitably would have uncovered the same evidence *or*

30

other compelling facts establishing that the disputed evidence inevitably would have been discovered." 61 F.3d at 499 (emphasis in original).

In this case, the Court finds that compelling facts exist to show that the plastic bags of cocaine would have inevitably been discovered had Officer Lane not unreasonably searched the Defendant's mouth. The first plastic bag discovered was found on the ground in close proximity to where Officer Lane's <u>Terry</u> pat of the Defendant's person for weapons, which the Court has already found to have been reasonable under the Fourth Amendment, took place. This bag was not found near the struggle that ensued after Officer Lane put his fingers in the Defendant's mouth on the hood of the cruiser. Accordingly, the Court finds that the first bag of cocaine fell out of the Defendant's clothing as a result of the first permissible pat down and not as a result of the second search. The additional two bags discovered, one on the ground in the vicinity of where the Defendant had been after the struggle with the officers and the other inside the Defendant's pants found during a search of his person, were discovered directly as a result of the impermissible search conducted by Officer Lane. However, because the first bag landed in plain view as a result of the permissible search and the officers would have had probable cause to arrest the Defendant for narcotics possession at the point when they saw that bag, the Court finds that the second and third bags would have been discovered in a lawful search incident to arrest of the Defendant had the intrusion into the Defendant's mouth not occurred. <u>See</u> <u>United States v. Wright</u>, 577 F.2d 378, 380 (6th Cir. 1978) ("There is no doubt that the police possess the power to search a lawfully arrested person thoroughly, both to protect themselves against a possible attack with a concealed weapon, and to prevent the destruction of evidence accessible to the person arrested.") The Court also notes that the K-9 unit was requested to dispatch during the brief lawful detention of the Defendant [Exhibit 1 at 15:31:48]

31

and that the K-9 arrived at the scene within minutes of that request, alerting the truck when it searched. Therefore, even if the officers would not have noticed the bag of cocaine near the rear bumper of the truck had the second search not occurred, the Court finds that the K-9 would have arrived prior to the issuance of the traffic citation and the conclusion of the lawful portion of the traffic stop and would have discovered and alerted to that bag, then providing probable cause to arrest the Defendant for narcotics possession and allowing for a lawful search incident to arrest. Moreover, even if the K-9 would not have discovered and alerted to the bag on the ground, the K-9 did alert the truck, providing probable cause to search the truck and allowing the officers the opportunity to search the area surrounding the truck, during which they would have inevitably discovered the bag near the rear bumper.

Accordingly, analyzing the circumstances as if the second search never occurred, the Court finds that it has been demonstrated beyond a preponderance of the evidence that the three bags of cocaine discovered at the scene of the traffic stop would have been inevitably discovered and acquired at the scene had the unlawful search not occurred. The Court also notes that in addition to the narcotics seized, the Defendant argues that the three cellular telephones seized should also be suppressed as fruits of the allegedly illegal search and seizure. However, because the Court has found that the initial detention and pat down was reasonable under the Fourth Amendment, that one bag of cocaine was properly seized, and that the other narcotics would have been inevitably discovered had the second search (of the Defendant's mouth) not occurred, the Court finds that the cellular telephones were properly seized and should not be suppressed. This finding is also supported by the fact that the Defendant does not challenge the search of his automobile except as such an argument may relate to the automobile search having been based upon the search and seizure

of his person which he claims was illegal.

In sum, the Court recommends that the motion to suppress evidence should be denied and that the narcotics, cellular telephones, and any other items seized be deemed admissible at trial.

## V.  CONCLUSION

After carefully considering the evidence, the parties' filings and arguments, and the relevant legal authorities, the Court finds no basis to suppress the evidence seized in this case.  For the reasons set forth herein, it is **RECOMMENDED** that the Defendant's Motion to Suppress All Evidence Obtained as a Result of Unlawful Search **[Doc. 24]** be **DENIED**.[3]

Respectfully submitted,

s/ C. Clifford Shirley, Jr.
United States Magistrate Judge

---

[3] Any objections to this report and recommendation must be served and filed within fourteen (14) days after service of a copy of this recommended disposition on the objecting party.  Fed. R. Crim. P. 59(b)(2) (as amended).  Failure to file objections within the time specified waives the right to review by the District Court.  Fed. R. Crim. P. 59(b)(2); see United States v. Branch, 537 F.3d 582, 587 (6th. Cir. 2008); see also Thomas v. Arn, 474 U.S. 140, 155 (1985) (providing that failure to file objections in compliance with the required time period waives the right to appeal the District Court's order).  The District Court need not provide de novo review where objections to this report and recommendation are frivolous, conclusive, or general.  Mira v. Marshall, 806 F.2d 636, 637 (6th Cir. 1986).  Only specific objections are reserved for appellate review.  Smith v. Detroit Fed'n of Teachers, 829 F.2d 1370, 1373 (6th Cir. 1987).

33